IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO.: 3:17-cr-0811 |
| | ) | |
| v. | ) | **MOTION TO SUPPRESS** |
| | ) | **WIRETAP EVIDENCE** |
| SANTERRIO SMITH, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

COMES NOW the Defendant, by and through his undersigned counsel, and respectfully moves this Court to suppress any and all materials and/or evidence, as well as the fruits thereof, obtained through the use of Title III wiretaps pursuant to 18 U.S.C. § 2518. The Defendant's grounds for this motion are that the applications and supporting affidavits submitted by the government to obtain the wiretap orders were not sufficient to comply with the mandate of 18 U.S.C. § 2518. Specifically, the Defendant asserts that the government failed to comply with Title III application procedures, the interceptions were issued without a showing of necessity, the government did not comply with the minimization requirements, the applications and affidavits do not contain sufficient probable cause to issue the wiretaps, and the tapes were not properly sealed. The evidence this motion seeks to suppress includes:

1. All telephone conversations recorded pursuant to the Applications for the Interception of Wire Communications and all subsequent Applications for Continued Interception of Wire Communications.

2. All telephone conversations intercepted and recorded by the government in relation to Target Phones 1-7 that contain the Defendant's voice or mention, pertain, or relate to the Defendant.

3. The contents of all intercepted wire communications to which the Defendant was a party.

## BACKGROUND

According to the allegations set forth in the various filings of the United States Government, the Columbia Violent Gang Task Force ("CVGTF") has been investigating the Smith Brothers Neighborhood Based Gang ("NBG"), as well as other gangs in the Columbia area, since 2007. Special Agent Jason Greenan's March 30, 2017 Affidavit in Support of Application for the Interception of Wire Communications over Target Phones 1, 2, &3 (" March Affidavit") details that information has been gathered on the Smith Brothers NBG's illegal activities through confidential sources, interviews of cooperating defendants, controlled purchases, consensual recorded conversations, pen register and telephone toll record analysis, court authorized Title III wiretaps from past investigations, and information from local and state law enforcement. This evidence has allegedly shown that the NBG is involved in the distribution of illegal drugs, firearms violations, crimes of violence in furtherance of drug distribution activities, and illegal dog fighting.

On March 30, 2017, the FBI began intercepting voice and text communications from defendant over court authorized Title III intercepts. In the instant case, the government first sought a wiretap for 803-638-9350 ("Target Phone 1") subscribed to by Dantrell Markeis Smith, 803-729-1653 ("Target Phone 2") subscribed to by Santerrio Montinez Smith, and 803-743-5574 ("Target Phone 3"), also subscribed to by Santerrio Montinez Smith. The Application for Interception of Wire and the supporting Affidavit was submitted to the Court on March 30, 2017. The Application was approved and an Order issued on March 30, 2017 for a thirty (30) day period. The interceptions commenced the following day.

An Application for Continued Interception of Wire and Electronic Communications for

Target Phone 2 and 3, and an Application for Interception of Wire and Electronic Communications for Target Phone 4 and 5 was approved and an Order issued on May 8, 2017.

An additional Application for the Continued Interception of Wire and Electronic Communications over Target Phones 4 & 5 and Original Interception of Wire and Electronic Communications over Target Phones 6 & 7 was approved and an Order issued on June 6, 2017.

## STANDING

The Defendant has standing to challenge the legality of the March 30, 2017, May 8, 2017, and June 6, 2017 Applications, Affidavits, and Orders authorizing the wiretap of defendant's phones because he is an "aggrieved person" under 18 U.S.C.§ 2518(10)(a), and "any aggrieved person. . . may move to suppress the contents of any wire . . . communication intercepted pursuant to" Title III. 18 U.S.C. § 2518(10)(a). The statute defines an aggrieved person as any "person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). The Defendant's conversations on any target phones were recorded pursuant to the wiretap authorization from March 30, 2017, and the continued wiretap authorizations from May 8, 2017, and June 6, 2017.

Accordingly, the Defendant has standing to challenge the sufficiency of the affidavits supporting the wiretap applications, the legality of the order authorizing the wiretap, and the admissibility of the wiretap recordings.

## ARGUMENT

The Fourth Amendment's proscription against unreasonable searches and seizures "extends… to the recording or oral statements overheard." *Katz v. United States*, 389 U.S. 347, 353 (1967). Thus, for the government to conduct electronic surveillance, it must first resort to judicial process to comply with the Fourth Amendment. *See i.d*., at 354. Specifically, the government must

comply with certain statutory requirements governing the interception of electronic communications, including wiretaps. *See* 18 U.S.C. § 2510, *et. seq*. However, before the government can obtain authorization for a wiretap, the government must follow the statutory scheme set forth in § 2518. *See* 18 U.S.C. § 2518. Under § 2518(1), a wiretap application must be submitted in writing and made under oath for the court to consider it. *See i.d*. Such an application must contain the following information before a court may approve it:

1) The identity of the applicant;

2) A list of the "facts and circumstances relied upon by the applicant to justify his belief that an order should be issued.

3) A statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous;

4) The time period requested for the maintenance of the interception;

5) A description of all prior applications known to the applicant; and

6) A statement as to whether the application is to extend a prior order and the results obtained from any prior interception.

18 U.S.C. § 2518(1)(a)-(f).

### I. THE GOVERNMENT FAILED TO COMPLY WITH TITLE III APPLICATION PROCEDURES

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, prescribes the procedure for securing judicial authority to intercept wire communications. Under 18 U.S.C. §2516(1), "[t]he Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy

Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General may authorize an application to a federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation...”

The Application for Interception of Wire and Electronic Communications over Target Phones 1, 2, and 3 filed March 30, 2017 ("March Application"), and The Application for the Continued Interception of Wire and Electronic Communications over Target Phones 2 & 3, and Original Interception of Wire and Electronic Communications over Target Phones 4 and 5 filed May 8, 2017 ("May Application") both contained authorizations from Trevor McFadden, Deputy Assistant Attorney General, to Beth Drake, Interim United States Attorney, to the attention of Jane B. Taylor, Assistant United States Attorney, authorizing Ms. Drake or "any other attorney on the staff who is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code" to make the applicable wiretap applications.

The March Application and the May application both begin with the following paragraph, "Jane B. Taylor, Assistant United States Attorney for the District of South Carolina, an attorney of the United States Department of Justice, being duly sworn, states:..."

However, the applications are not signed by Jane B. Taylor, but instead signed by Nick Bianchi with a note in parentheses by each signature stating "(Bianchi for Taylor)".

As a result of Mr. Bianchi's signing the affidavit in which Ms. Taylor was duly sworn to state the facts alleged in the affidavit, the application was defective and should not have been issued as the application did not comply with Title III application procedures. Any evidence obtained through

the use of the wiretaps, and any fruits thereof, should be suppressed.

## II.     THE GOVERNMENT FAILED TO DEMONSTRATE THAT LESS INTRUSIVE INVESTIGATIVE ALTERNATIVES HAD FAILED

One factor a court must consider in issuing a wiretap is whether the application showed that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. 2518(3)©.  The purpose of this subsection is "to ensure that the relatively intrusive devise of wiretapping is 'not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995) (citing *Kahn* 415 U.S. 143, 153 n.12 (1974)).

Defendant is challenging the Government's allegation that other investigative techniques had been tried and failed, that they were unlikely to succeed if tried, and/or they were too dangerous as applicable under 18 U.S.C. § 2518(1)© as the investigative techniques utilized prior to the March Affidavit and Application were proving successful and there was no necessity to issue wiretaps at that time.

The March Affidavit details that normal investigative techniques had been used including controlled purchases, surveillance, confidential sources, interviews of cooperating defendants, and pen register analysis in order to identify, investigate, gather evidence and develop patterns and habits of members of the Smith Brothers NBG. However, Special Agent Jason Greenan asserts that normal investigative techniques have been tried and failed, reasonably appear unlikely to succeed if tried, or are too dangerous.

Physical surveillance had allowed agents to identify at least four houses owned by members of the Smith Brothers NBG. Agents have confirmed that drugs are sold and/or stored, and dogs are fought at two of the four houses. Further, agents have been able to conduct physical surveillance on

meetings between various members of the Smith Brothers NBG, as well as during controlled drug purchases, and during meetings between sources and targets. *March Affidavit, ¶¶136-138.*

During controlled purchases and various interaction with targets, sources and undercover officers have been able to wear concealed video recorders which have permitted agents to view what the target subjects are doing. Through the use of video recorders, agents have also been able to identify target subjects. *March Affidavit, ¶¶139.*

The government had multiple cooperating defendants whom had provided information to agents throughout the years. Further, at least three confidential sources, Source One, Source Two, Source Three, and at least three undercover officers had infiltrated the Smith Brothers NBG and had been providing information to the government. Although the government claims that defendant regarded Source Three as a low level outlying member of the organization, *March Affidavit, Footnote 44*, Source Three was close enough to defendant that he was able to send SMS messages and call defendant on the phone. *March Affidavit, ¶¶122-124*. Further, Source Three was still in a position at the time of the Affidavit to continue to report on the activities of defendant. *March Affidavit, ¶150*.

The Agent's dilemma that the investigation before him was onerous, as is any criminal drug enterprise investigation, cannot transform a bare assertion that the only effective method of investigation would be interception of certain phones into "necessity"- as any large scale criminal investigation is onerous making traditional forms of investigation problematic. *See United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983) (Affidavit failed to meet Title III's exhaustion requirement because it failed to explain why the narcotics case under investigation presented problems different from any other narcotics case); *See also United States v. Kalustian*, 529 F.2d 585, 589(9th Cir. 1976) (The Court rejected an affidavit as insufficient to establish the need for electronic surveillance under

Title III stating "[t]he affidavit does not enlighten us as to why this gambling case presented any investigative problems which were distinguishable in nature or degree from any other gambling case. In effect the Government's position is that all gambling conspiracies are tough to crack....") In the instant circumstances, the use of many forms of investigation was proving successful, and the use of electronic surveillance cannot pass muster. *See Lilla*, 699 F.2d at 104-05 (reversing convictions where "[t]he record ... does not support the conclusion that other investigative procedures were either unlikely to succeed or were too dangerous to use. If anything, the record establishes the contrary position: the normal investigative procedures that were used were largely successful...")

In this case, it was shown that the Government was successfully using traditional methods of investigation to expose the crimes. There has been no showing that those methods were tried and failed, unlikely to succeed, and/or unduly dangerous and as such, issuance of the original wiretap order was unnecessary and therefore invalid, and all subsequent evidence as it pertains to defendant should be suppressed.

### III.   THE WIRETAP APPLICATION LACKED PROBABLE CAUSE

In addition to outlining the prerequisites to obtaining a wiretap, § 2518 provides a mechanism for a party to request the suppression of the fruits of a wiretap. Specifically, subsection (10) provides:

> "Any aggrieved person… may move to suppress the contents of a wire or oral communication intercepted pursuant to this Chapter, or evidence derived therefrom, on the grounds that (I) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10).

Under Title III, an order authorizing the interception of telephone conversations must be based upon probable cause that an individual is involved in a specified offense and that communications concerning that offense will take place on the facilities subject to interception. 18

U.S.C. § 2518 (3)(a)-(b). Here, although the application for the wiretap order contains an extensive recitation of factual allegations, it fails to establish probable cause that the defendant was involved in the specified criminal activity.

The information contained in the March Affidavit purporting to provide probable cause to tap defendants' phones is stale, irrelevant to defendant, and/or unreliable.

Paragraphs 28 through 37 of the Affidavit discuss investigations from 2007-2009 in which the defendant was a subject. During Operation Hustle N' Flow in 2007, agents made three controlled drug purchases from the Smith Brothers. The buys are detailed in paragraphs 30-33 of the March Affidavit. However, controlled buys from 2007 do not give probable cause for a wiretap in 2017.

Paragraphs 34-37 detail events from June - July 2007 in which Pit Bull dogs and stolen ATV's were found at 647 Campground Road. Defendant was arrested and charged with Ill Treatment of Animals (Torture) but the arrest did not result in a conviction. Again, this information is ten years old and defendant was arrested at the time. He was not convicted of the charges. This information was stale at the time the wiretaps were applied for and cannot be used to justify probable cause.

During Operation Dark Knight in 2008 and 2009, agents learned that the Smith Brothers had continued their narcotics distribution activities. According to Pearish Pierre Pretty, a cooperating defendant, a black male known as "Malcolm" hung around and dealt with the Smith Brothers in 2008-2009. *March Affidavit ¶29.* Recently, agents learned that a David Malcolm Douglas co-owns a residence with defendant. However, there is nothing illegal about co-owning a residence and the government has not made any showing that the "Malcolm" from 2008 is the same person as David Malcolm Douglas from 2017.

In September 2011, as detailed in paragraphs 38 and 39, The Richland County Sheriff's Department received an anonymous call about dog fighting at 647 Campground Road. When

deputies responded, they saw an active dog fight and the participants fleeing into the woods. A vehicle speeding away almost hit a responding deputy. After investigation, defendant was charged with two counts of attempted murder as well as animal fighting. The charges did not result in a conviction. Again, events that occurred seven years ago that defendant has been charged with and not convicted of did not establish probable cause for the wiretap.

In paragraphs 40-48, the government lists various cooperating defendants who provided information. However, much of this information is stale, the witnesses are no longer cooperating and/or it does not apply to defendant Smith.

William Larry Jarvis states he witnessed some dog fights at 647 Campground Road. He never mentions defendant's name, his statements were from 2011-2012, and he is currently in the Bureau of Prisons and unable to cooperate further. *March Affidavit, ¶41.*

Jason Lundees Washington was interviewed in February 2012. He details drug interaction with defendant, however he is unable to cooperate further because he is on Federal Supervised Release. *March Affidavit, ¶42.*

Rodriguez Darnell Mealing was interviewed multiple times in 2011. He told agents he sold defendant narcotics between 2005-2008. Mealing is unable to provide further assistance because he is on Supervised Release and it is known to his associates that he cooperated with the government. *March Affidavit, ¶¶43-45.*

Eric Dean Smith was interviewed in 2015 and 2016 on numerous occasions. He was a significant cocaine supplier and dog fight promoter prior to his arrest. Smith's name is not mentioned as a known associate. *March Affidavit, ¶46.*

Pearish Pierre Pretty was interviewed in 2009 and 2010. He states that he sold defendant narcotics in 2005-2006 and in 2008 or 2009. He is currently in custody of the Bureau of Prisons and

unable to provide additional cooperation. *March Affidavit, ¶47.*

Leon Blackmon was interviewed in 2016. Blackmon does not mention the defendant as a known associate. *March Affidavit, ¶48.*

The most recent interviews the government conducted were from 2015 and 2016 from Eric Dean Smith and Leon Blackmon. Neither Smith nor Blackmon mention the defendant in their statements. The other interviews are stale as they contain information that ranges from six to twelve years old. Further, none of the cooperating defendants are in a position to cooperate further and to provide information that is not outdated.

On July 12, 2015, The Richland County Sheriff's Department received a Lojack GPS hit on a stolen motorcycle at 1920 Crane Church Road. When deputies approached, three black males ran from the residence. According to paragraph 49 of the Affidavit, one of the individuals was the defendant, however the Affiant provides no reason for this claim. Further, the only person arrested and convicted as a result of a search warrant at the residence was Jacobi Green. The government cannot provide bare bones assertions with no proof of their claims to assert probable cause for a wiretap.

On November 6, 2015, defendant was arrested inside a residence located at 6507 Frost Avenue. He was charged with trafficking 100 grams or more of cocaine as well as possession with intent to distribute crack cocaine. Defendant was released on bond and those charges are still pending. That arrest, in and of itself, was not sufficient probable cause to issue the wiretap.

Paragraphs 51 through 64 detail controlled purchases made by undercover agents starting in May 2016. Eight of the sales involved defendant's brother, Dantrell Smith. Defendant was present for one sale, detailed in paragraph 61, however the Affidavit does not state that UC Three physically saw defendant with any narcotics. It makes a bare bones claim that defendant gave the drugs to

Kevin Myers without any corroborating evidence.

Further, the undercover agent made two attempts to buy drugs from Myers, who was attempting to get the drugs from a contact in his phone listed as "Terry O". Neither of these January 2017 attempts resulted in a controlled purchase. A third attempt in January 2017 with the defendant also did not result in a controlled purchase.

The government also relies on subpoenaed telephone toll records, court authorized pen registers and trap and trace data for Target Phones 1, 2 and 3. The information was used to show that the defendant had contact with telephone numbers associated with known or suspected drug traffickers. The information was also used to establish probable cause for the wiretaps by connecting defendant's calls to Myers during the days and times the undercover agents were attempting to make controlled purchases from Myers.

In paragraph 165 of the March Affidavit, the government agrees that the pen registers and toll records only provide circumstantial evidence and do not identify the individuals actually making and receiving the telephonic communication to or from the target telephone. Yet, the government used that same information to link defendant to Myers.

As the Fourth Circuit made clear in *United States v. Rhynes*, "the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." 196 F.3d 207, 234 (1999); see also *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (staleness not measured "solely by counting the days on a calendar"). "Rather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." 196 F.3d at 234). *United States v. Farmer*, 370 F.3d 435, 439 (4th Cir. 2004) (quoting *Rhynes*, 196 F.3d at 234).

Defendant asserts that the length of time between the alleged illegal activity and the issuance of the wiretap order in this case does render the information stale, and that the above cited cases can be distinguished. The information contained in the affidavit in *Farmer* ranged from nine months to approximately one year old. 370 F.3d at 438-439. The information contained in the *Spikes'* Affidavit spanned a period of four years, two of which defendant Spikes spent in jail. 158 F.3d 913, 924. In addition, the Affidavit in the *Spikes* case was submitted in connection with a search warrant, not to issue a wiretap which has more stringent guidelines. In the case at bar, the evidence contained in the March Affidavit was up to twelve years old and mostly based upon cooperating defendants who are no longer available to provide additional information, in addition to facts not associated with defendant Smith. Pursuant to 18 U.S.C. § 2518(10), the order of authorization or approval under which the wiretap was issued was insufficient on its face and therefore any and all evidence obtained as a result should be suppressed.

### IV.     THE WIRETAPS WERE NOT PROPERLY MINIMIZED

Minimization is required under 18 U.S.C. §2518(5), which provides, in relevant part:

> Every order and extension [of a wiretap order authorized under this section] shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

The March 30, 2017 Order Authorizing The Interception of Wire and Electronic Communications over Target Phones 1, 2 & 3 and the May 8, 2017 Order Authorizing The Continued Interception of Wire and Electronic Communications over Target Phones 2 & 3 and

Original Interception of Wire and Electronic Communications Over Target Phones 4 & 5 required the government to conduct the interceptions "in such a way as to minimize the interception and disclosure of communications intercepted to those communication relevant to the pending investigation." Further, the Order required the government to terminate monitoring "immediately when it is determined that the conversation is unrelated to communications subject to interception under Title 18…" *See RW 06742-06743 and RW 06815.*

The Supreme Court has held that in the context of minimization, the ordinary Fourth Amendment standard of objective reasonableness governs the agent's conduct. *Scott v. United States*, 436 U.S. 128, 137 (1978).

Based upon the statistics provided by the government, it does not appear that proper minimization occurred and, as such, the procedures utilized were not objectively reasonable. Examples of calls that were not minimized on Target Phone 2 are as follows:

1. Session 326: Santerrio Smith and Tory Schwinn discuss the sale of a Chevrolet Z71. The call lasts thirty-three seconds.

2. Session 633: Santerrio Smith and Jess discuss what time Metro PC closes. The call lasts thirty-three seconds.

3. Session 1350: Santerrio Smith and Kip talk about a dump truck for sale. The call lasts fifty-two seconds.

4. Session 1353: Santerrio Smith and Dantrell Smith talk about a crime scene behind the trailer park and a body. The call lasts one minute and thirty-three seconds.

5. Session 1497: Santerrio Smith and a second girlfriend discuss spending the night together but he is on house arrest. Smith talks about getting his ankle monitor off soon. The call lasts five minutes and eighteen seconds.

6. Session 1581: Santerrio Smith and Terrence Dunlap talking about buying and selling trucks. The call lasts three minutes and one second.

7. Session 1582: Santerrio Smith and Terrence Dunlap continue to talk about purchasing trucks. The call lasts ten minutes and fourteen seconds.

8. Session 1653: Santerrio Smith and Sandra Smith discuss an accident he was in where the other driver was high. The call lasts fifty-nine seconds.

9. Session 1801: Santerrio Smith and James Earl Green talk about buying a Dodge truck at the auction. Call lasts three minutes and forty-four seconds.

10. Session 2456: Santerrio Smith and an unknown male talk about a cookout in the hood and a job at a trucking business that the unknown male got. The call lasted two minutes and fifty-four seconds.

Examples of calls that were not minimized on Target Phone 3 are as follows:

1. Session 993: Santerrio Smith and Dantrell Smith talk about buying cars at an auction and talk about white people. Call lasts ten minutes and thirteen seconds.

2. Session 1008: Santerrio Smith and Bolie talk about moving a car because the rain is coming. Call lasts one minute.

3. Session 1037: Santerrio Smith and Terrence Dunlap talk about a car that needs its gaskets replaced. Call lasts ten minutes and six seconds.

The First Progress Report filed May 4, 2017, shows only 21 out of 1390 completed calls were minimized, for a total of .01% of completed calls minimized for Target Phone 2. For Target Phone 3, the First Progress Report shows only 13 out of 807 completed calls minimized, for a total of .01%. *See RW 0697-0698.*

The Second Progress Report filed May 11, 2017, shows only 15 of 1187 completed calls

minimized on Target Phone 2. Only 1% of completed calls were minimized. Target Phone 3 had 796 completed calls. Only 16 calls, or 2%, were minimized. *See RW 06914.*

The Third Progress report was filed on May 25, 2017. For Target Phone 2, out of 758 completed calls, only 13 calls were minimized, or a total of 1.7%. Sixteen of Target Phone 3's 538 completed calls were minimized, which equates to 2.9%.

In the Fourth Progress Report, filed on June 19, 2017, Target Phone 2 had 361 completed calls. Only seven were minimized, or 1.9%. Target Phone 3 had 469 completed calls. Twelve were minimized, or 2.5%.

The examples provided above, in addition to the extremely low percentages of minimized calls, shows that the conversations intercepted were not limited to those relevant to the pending investigation. Considering that "the protection of privacy was an overriding congressional concern" when Title III was enacted, the agents in this circumstance were not acting in an objectively reasonable manner and the wiretaps should be suppressed. *Gelbard v. United States,* 408 U.S. 41, 48 (1972).

### V.     THE WIRETAPS WERE NOT SEALED IN A TIMELY MANNER

Section 2518(8)(a) requires the government to record Title III interceptions and to present all such recordings to the authorizing judge for sealing under the court's direction, "immediately upon the expiration of the period of the order, or extensions thereof." This sealing provision was deemed so important to maintaining the integrity of electronic surveillance, that Congress made it a prerequisite to the government's use of the recordings or of "evidence derived therefrom." 18 U.S.C. § 2518(8)(a).

Section 2518(8)(a) sets out the provisions of Title III intended to protect the integrity of the information obtained by otherwise lawful electronic surveillance. First, the subsection requires that

"[t]he contents of any [intercepted] wire, oral or electronic communications... be recorded." Second the subsection requires that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings...shall be sealed" under the direction of the court. Finally, § 2518(8)(a) requires the suppression of the contents of the recordings, "or evidence derived therefrom," unless the court finds "[t]he presence of the seal...or a satisfactory explanation for the absence thereof."

In *United States v. Rios*, 875 F.2d 17 (2nd Cir. 1989), the government appealed from an order suppressing certain electronic surveillance evidence because the government had neither immediately sealed the recordings, nor provided a satisfactory explanation for the delays. The Supreme Court affirmed the Second Circuit's holding that § 2518(8)(a) applies to delays in sealing, as well as failures to seal. The Court emphasized the congressional intent to "insure the reliability and integrity of evidence maintained by means of electronic surveillance," *United States v. Rios*, 495 U.S. 260, 263 (1990).

Target Phones 2 and 3 were tapped from March 30, 2017 until April 29, 2017 and an extension was granted from May 8, 2017 to June 6, 2017. The tapes were sealed on June 15, 2017, nine days later.

In the government's sealing applications, there are two references to non-traditional telephony associated with electronic communications. The discs contained both non-content and content information. The first instance involves three discs of information associated with electronic communications from March 21, 2017 to April 29, 2017. The government became aware of these discs on May 12, 2017 but they were not sealed until May 22nd. The second instance involved additional discs of non-traditional telephony information. These discs were sealed on June 15, 2017, however the end dates of these discs range from May 14th to June 7th, which gives a sealing range

of 8 days to one month.

The government's sealing application also divulges that on October 19, 2017, a FBI technician discovered that the download process for Target Phone 1 was imperfect and the computer failed to download data from April 28th to April 29, 2017. This information was not sealed until October 24, 2017.

Defendant submits that the original tapes should have been sealed during the nine day delay between the March Application and the May Application. The government's delay in seeking reauthorization of the March Order must be satisfactorily explained by the government, otherwise the tapes should have been sealed.

However, even if the government's delay in seeking reauthorization of the March Order is found to be satisfactorily explained, defendant contends that the nine days between the May Order expiring and the date of sealing is not immediate and requires suppression of the tapes.

Section 2518(8)(a) provides no definition for "immediately." *See* 18 U.S.C. §2518(8). Various circuits have found that recordings sealed within one or two days is reasonable. *See United States v. Matthews*, 431 F.3d 1296, 1307 (11th Cir. 2005), United States v. McGuire, 307 F.3d 1192, 1204 (9th Cir. 2002), *United States v. Wilkerson*, 53 F.3d 757, 759 (6th Cir. 1995), *United States v. Wong*, 40 F.3d 1347, 1375 (2nd Cir. 1994). The Seventh Circuit found ten days was too long to be immediate. *United States v. Coney*, 407 F.3d 871, 873 (2005). The Fourth Circuit has found that a thirteen-day delay is too long. *United States v. McWilliams*, 530 F. Supp. 2d 813 (2008).

The government must provide a satisfactory explanation not only to the delay in sealing the tapes, but also as to why it is excusable. *United States v. Ojeda Rios*, 495 U.S. 257, 265 (1990).

Section 2518(8)(a) has an explicit exclusionary remedy for noncompliance with the sealing requirement. "The presence of the seal provided for by this subsection, or a satisfactory explanation

for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517." 18 U.S.C. §2518(8). Thus, absent a satisfactory explanation by the government as to why the tapes were not sealed in a timely manner, and why it is excusable, the wiretap evidence should be suppressed under section 2518(8)(a)'s explicit exclusionary remedy.

## CONCLUSION

The applications and supporting affidavits submitted by the government to obtain the wiretap orders were not sufficient to comply with the mandate of 18 U.S.C. § 2518. Specifically, the government failed to comply with Title III application procedures, the interceptions were issued without a showing of necessity, the government did not comply with the minimization requirements, the applications and affidavits do not contain sufficient probable cause to issue the wiretaps, and the tapes were not properly sealed.

For the foregoing reasons, the Defendant respectfully requests that the Court suppress any and all wiretap evidence in this case, as well as any fruits obtained from those wiretaps.

    Respectfully submitted,

    /s/Jack B. Swerling
    Jack B. Swerling, Federal I.D. # 4406
    1720 Main St., Ste. 301
    Columbia, SC 29201
    Phone: (803) 765-2626
    Email: jacklaw@aol.com
    *Attorney for the Defendant*

Columbia, South Carolina

October 12, 2018